IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| GULF UNDERWRITERS INSURANCE COMPANY and THE TRAVELERS INDEMNITY COMPANY, | * * * * * | 4:07-cv-00135 (LEAD CASE) |
| Plaintiffs, | * * | |
| v. | * * | |
| CITY OF COUNCIL BLUFFS, DANIEL LARSEN, LYLE BROWN, and DAVID DAWSON, | * * * * | MEMORANDUM OPINION AND ORDER |
| Defendants. | * * | |
| GENESIS INSURANCE COMPANY, | * * * | 1:07-cv-00018 |
| Plaintiff, | * * | |
| v. | * * | |
| THE CITY OF COUNCIL BLUFFS, DANIEL LARSEN and LYLE BROWN, | * * * * | |
| Defendants. | * * | |
| CHICAGO INSURANCE COMPANY, an Illinois Corporation, | * * * | 1:07-cv-00021 |
| Plaintiff, | * * | |
| v. | * * | |
| THE CITY OF COUNCIL BLUFFS, IOWA, DANIEL C. LARSEN, in his individual and official capacities, and LYLE W. BROWN, in his individual and official capacities, | * * * * * | |
| Defendants. | * * | |

| | | |
|---|---|---|
| COLUMBIA CASUALTY COMPANY, | * | |
| | * | |
| Plaintiff, | * | 1:07-cv-00024 |
| | * | |
| v. | * | |
| | * | |
| CITY OF COUNCIL BLUFFS, IOWA, DANIEL C. LARSEN, LYLE W. BROWN, DAVID DAWSON, TERRY HARRINGTON, and CURTIS W. McGHEE, JR., | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| Defendants. | * | |
| | * | |

| | | |
|---|---|---|
| | * | |
| SPECIALTY NATIONAL INSURANCE COMPANY, | * | 4:09-cv-00431 |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| THE CITY OF COUNCIL BLUFFS, IOWA, DANIEL C. LARSEN and LYLE W. BROWN, | * | |
| | * | |
| | * | |
| | * | |
| Defendants. | * | |
| | * | |

| | | |
|---|---|---|
| | * | |
| CITY OF COUNCIL BLUFFS, DANIEL LARSEN and LYLE BROWN, | * | |
| | * | |
| | * | |
| Third-Party Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| ADMIRAL INSURANCE COMPANY and ACCEPTANCE INSURANCE COMPANY, | * | |
| | * | |
| | * | |
| Third-Party Defendants. | * | |
| | * | |

Before the Court are two motions for summary judgment. The first motion was filed by

Plaintiffs Gulf Underwriters Insurance Company ("Gulf") and Travelers Indemnity Company ("Travelers") (collectively "Gulf") on February 24, 2010. Clerk's No. 101. The City of Council Bluffs (the "City"), Daniel C. Larsen ("Larsen"), and Lyle W. Brown ("Brown") (collectively "Defendants")[1] filed a response in opposition to Gulf's motion on April 19, 2010. Clerk's No. 112. Gulf filed a reply on May 10, 2010. Clerk's No. 117. The second motion was filed by Plaintiff Genesis Insurance Company ("Genesis") on April 6, 2010. Clerk's No. 109. Defendants filed a response in opposition to Genesis' motion on May 12, 2010. Clerk's No. 118. Genesis filed a reply on June 11, 2010. Clerk's No. 127. The Court held a hearing on both motions on November 3, 2010. Clerk's No. 162. Genesis and Defendants also filed, with leave of Court, supplemental briefs regarding Genesis' motion.[2] Clerk's Nos. 160, 161. The matters are fully submitted.

## I. FACTUAL & PROCEDURAL BACKGROUND

These cases arise out of two underlying actions filed against Defendants by Terry Harrington ("Harrington") and Curtis McGhee ("McGhee") (collectively "Claimants"): *Harrington v. County of Pottawattamie, et al.*, Case No. 4:05-cv-00178 and *McGhee v.*

---

[1]        David Dawson ("Dawson"), a named defendant in Case No. 4:07-cv-00135, also joined the response. However, Dawson is not seeking coverage under the Gulf Policies and is not a party to Case No. 1:07-cv-00018. Moreover, the Court has dismissed all claims against Dawson in the underlying litigation. Therefore, for the purposes of this order, the Court has not included Dawson in its definition of "Defendants."

[2]        Curtis McGhee, who is a party to related Case No. 1:07-cv-00024, filed a "Resistance to Genesis' Second Supplemental Brief in Support of its Motion for Summary Judgment" and a motion for leave to file that "resistance" on November 10, 2010. Clerk's Nos. 164, 164-1. However, McGhee is not a party to Genesis' case, Case No. 1:07-cv-00018. Therefore, McGhee's motion for leave to file is denied.

*Pottawattamie County, et al.*, Case No. 4:05-cv-00255 (collectively "the Underlying Actions").[3]
*See* Pls.' Statement of Material Undisputed Facts in Supp. of Their Mot. for Summ. J.
(hereinafter "Gulf Facts") ¶¶ 11-12 (Clerk's No. 101-1); Genesis Ins. Co.'s Statement of
Material Facts for its Mot. for Summ. J. as to Count III of its First Am. Compl. for Declaratory J.
(hereinafter "Genesis Facts") ¶ 24–25 (Clerk's No. 109-1). The City provided notice of the
Underlying Actions to various insurers that had issued policies to the City between 1977 and
2005. *See* Gulf Facts ¶ 31. In 2007, Gulf and Genesis filed lawsuits against Defendants,
seeking, *inter alia*, declaratory judgments that their respective policies do not provide coverage
for the Underlying Actions. *See* Clerk's No. 1 at 11–12; Case No. 1:07-cv-00018, Clerk's No. 1
at 9. These cases, along with others, have been consolidated for trial. *See* Clerk's No. 22.

A. *The Underlying Actions*

Claimants were arrested in 1977 for the murder of former police officer John Schweer
("Schweer"). Gulf Facts ¶¶ 14-15; Genesis Facts ¶¶ 13–14. In 1978, both Claimants were
convicted for Schweer's murder and sentenced to life imprisonment. Gulf Facts ¶¶ 16–17;
Genesis Facts ¶¶ 15–16. Harrington received previously-undisclosed exculpatory police records
in 1999 and filed a petition for post-conviction review on March 3, 2000. Gulf Facts ¶¶ 21–22.
In February 2003, the Iowa Supreme Court reversed Harrington's conviction. *Harrington v.
State*, 659 N.W.2d 509 (Iowa 2003); *see also* Genesis Facts ¶ 19; Gulf Facts ¶ 23. In April 2003,
Harrington was released from jail. Genesis Facts ¶ 21. Later that year, McGhee agreed to an
*Alford* plea and was also released from jail. Gulf Facts ¶ 24; Genesis Facts ¶¶ 22–23.

In 2005, Claimants filed the Underlying Actions. The Underlying Actions were

---

[3]     In its statement of facts, Gulf incorrectly identifies the names and numbers of
these cases. The Court takes judicial notice of the correct case citations.

consolidated in 2009 and are presently pending before this Court. *See* Case No. 4:03-cv-90616, Clerk's No. 104. Discovery in the Underlying Actions is closed and the cases have proceeded through summary judgment.[4]

The following claims are currently pending in the Underlying Actions:[5]

> Harrington still has the following claims pending against Defendants: Counts 1 and 2 (claims against Defendants for violation of 42 U.S.C. § 1983) and Count 3 (claims against Defendants for conspiracy under 42 U.S.C. § 1985(3)). McGhee still has the following claims pending against Defendants: Counts 1 and 5 (claims against Larsen and Brown, in their individual capacities, for violation of 42 U.S.C. § 1983); Count 15 (a claim against Larsen and Brown for conspiracy under 42 U.S.C. § 1985(3)); Count 18 (a claim against the City for violation of § 1983); and Count 19 (a claim against the City for indemnity).

*See* Case No. 4:03-cv-90616, Clerk's No. 224 at 3 (footnotes omitted). As the Court recently decided, Claimants' remaining "§ 1983 claims seeking damages for constitutional injuries

---

[4]    Trial in the Underlying Actions was scheduled, until very recently, to begin in January 2011. However, the Eighth Circuit recently stayed trial in the Underlying Actions pending resolution of Defendants' interlocutory appeal. *See* Case No. 4:03-cv-90616 at Clerk's No. 249.

[5]    Defendants assert, in response to Genesis' motion, that Counts 31 and 32 of McGhee's complaint remain in the Underlying Actions. *See* Defs.' Mem. of Law in Supp. of Resistance to Genesis Ins. Co.'s Mot. for Summ. J. (hereinafter "Defs.' Br. re Genesis") at 2, 18 (Clerk's No. 118-4). However, contrary to Defendants' contentions, the Court dismissed Count 32 on February 23, 2007. *See* Case No. 4:05-cv-00255, Clerk's No. 183 at 88 n.20. Additionally, even if Count 31 remained in the Underlying Actions, that would not affect the Court's analysis of Genesis' motion. In determining whether the Genesis Policies provide coverage for McGhee's claims, the Court must focus on "whether the *facts* alleged 'bring the claim within the liability covered by the policy.'" *Stine Seed Farm, Inc. v. Farm Bureau Mut. Ins. Co.*, 591 N.W.2d 17, 18 (Iowa 1999) (quoting *Chipokas v Travelers Indem. Co.*, 267 N.W.2d 393, 395 (Iowa 1978)); *see also Auto-Owners Ins. Co., Inc. v. Noyes*, No. C96-0061, 1997 WL 33558631, at *5 (N.D. Iowa Jan. 14, 1997). The facts alleged in Count 31 are substantially identical to the facts alleged in Count 18; the only difference of any note is that these two counts have different titles. *Compare* Case No. 4:05-cv-00255, Clerk's No. 1 ¶¶ 469–72 *with id.* at ¶¶ 392–95. Therefore, because the Court must focus its analysis on the factual allegations and Count 31 does not allege any facts beyond those alleged in Count 18, the presence or absence of Count 31 is immaterial to the resolution of the pending motions.

resulting from their arrests, convictions, and incarcerations are in the nature of malicious prosecution because Plaintiffs essentially allege that their constitutional rights were violated as a result of the wrongful institution of legal process against them." *Id.* at 13.

### B. *Additional Facts Relevant to Gulf's Motion*

Gulf issued two insurance policies to the City: (1) a primary insurance policy (hereinafter the "Gulf Primary Policy"); and (2) an excess insurance policy (hereinafter the "Gulf Excess Policy") (collectively the "Gulf Policies"). Gulf Facts ¶¶ 1, 3. Both of the Gulf Policies were effective from January 1, 2000 to January 1, 2001. *Id.* In November 2000, Brown and Larsen gave depositions in the case of *Harrington v. State*. *See* Defs.' Statement of Additional Facts Submitted in Resistance to Mot. for Summ. J. ¶¶ 5, 9.

### C. *Additional Facts Relevant to Genesis' Motion*

Genesis issued two separate, consecutive indemnity insurance policies to the City. Genesis Facts ¶ 5. The first policy was effective from January 1, 2002 to January 1, 2003 and the second was effective from January 1, 2003 to January 1, 2004 (collectively the "Genesis Policies"). *Id.*

## II. STANDARD FOR SUMMARY JUDGMENT

The term "summary judgment" is something of a misnomer.[6] *See* Hornby, D. Brock, *Summary Judgment Without Illusions*, 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive. *Id.* at 273, 281. The complexity of the process,

---

[6] Judge D. Brock Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." Hornby, D. Brock, *Summary Judgment Without Illusions*, 13 Green Bag 2d 273, 284 (Spring 2010).

however, reflects the "complexity of law and life." *Id*. at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id*. at 281–82. Despite the seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."[7] *Id*. at 281. Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call." *Id*. at 287.

Federal Rule of Civil Procedure 56(b) provides that "[a] party against whom relief is sought may move at any time . . . for summary judgment on all or part of the claim." "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n.5 (8th Cir. 1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual

---

[7] Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment. *Id*. at 281 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336 (1979) and *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expectations and  increased pre-summary judgment court involvement. *See id*. at 283-88.

issue remaining to be tried." *Anderson v. Viking Pump Div.*, *Houdaille Indus.*, *Inc.*, 545 F.2d 1127, 1129 (8th Cir. 1976) (citing *Lyons v. Bd. of Educ.*, 523 F.2d 340, 347 (8th Cir. 1975)).

Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment upon motion after there has been adequate time for discovery.  Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994).  The Court does not weigh the evidence, nor does it make credibility determinations.  The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir. 1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weightwatchers of Quebec*, *Ltd. v. Weightwatchers Int'l, Inc.*, 398 F. Supp. 1047, 1055 (E.D.N.Y. 1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any.  *See Celotex*, 477 U.S. at 323; *Anderson*, 477 U.S. at 248.  If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts

showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed. R. Civ. P. 56(e)(2). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *Id.*; *Celotex*, 477 U.S. at 322-23; *Anderson*, 477 U.S. at 257. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248. "As to materiality, the substantive law will identify which facts are material . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Courts do not treat summary judgment as if it were a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In a motion for summary judgment, the job of a court is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson*, 477 U.S. at 249 and 10 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2712 (3d ed. 1998)). It is the responsibility of the parties to provide the evidence necessary for this assessment. *Id.* at 921.

### III. LAW AND ANALYSIS

#### A. *Issues Common to Both Motions*

The parties agree that Iowa law governs both the Gulf Policies and the Genesis Policies. *See* Hr'g Tr. 12:21–24, 27:23-24; Mem. of Law in Supp. of Gulf Underwriters Ins. Co.'s and the

Travelers Indem. Co.'s Mot. for Summ. J. (hereinafter "Gulf Br.") at 8–10 (Clerk's No. 101-2) (citing Iowa law); Defs.' Resistance to Pl.'s Mot. for Summ. J. (hereinafter "Defs.' Resist. re Gulf") at 3 (Clerk's No. 112); Genesis Ins. Co.'s Mem. in Supp. of its Mot. for Summ. J. as to Count III of Its First Am. Compl. for Declaratory J. (hereinafter "Genesis Br.") at 7 (Clerk's No. 109-2); Defs.' Mem. of Law in Supp. of Resistance to Genesis Ins. Co.'s Mot. for Summ. J. (hereinafter "Defs.' Br. re Genesis") at 7 (Clerk's No. 118-4). Therefore, the Court will apply Iowa law to its analysis of all of the applicable insurance policies.

1.    *Timing of decision.*

Defendants argue, in response to both motions, that it would be "premature" to rule on the issue of coverage until the factual records in the Underlying Actions are "fully developed."[8]

---

[8]    Notably, Defendants have not moved for more time for discovery, pursuant to Federal Rule of Civil Procedure 56(f). *See* Hr'g Tr. 29:19–20. Rather, Defendants frame their objections regarding timing as "more of a motion to stay." *Id.* at 31:14–15. Defendants argue that "we don't know what will happen at the trial court level with regard to what the jury will ultimately find." *See id.* 31:15–17. That may be, in some sense, true—but it is not sufficient to avoid summary judgment. *See Prior v. Rathjen*, 199 N.W.2d 327, 331 (Iowa 1972) ("[A] party opposing a motion for summary judgment is not entitled to rely on the hope of a subsequent magical appearance at trial of genuine issues of material fact." (quoting *U.S. Steel Corp. v. United States*, 305 F. Supp. 508, 513 (S.D.N.Y. 1969)). Defendants have neither explained how the jury might find any facts that have not yet been subject to discovery nor cited any case law indicating that the Court must wait to see "what the jury will ultimately find" before making a determination of insurance coverage. Defendants also suggest that a decision on coverage would be premature because the claims that have been dismissed in the Underlying Actions "remain[] subject to appeal" and thus "are not fully and finally resolved at this time." *See* Defs.' Br. re Genesis at 2. Defendants cite no authority indicating that it would be proper—let alone necessary—to wait until Defendants have exhausted all of their appeals before deciding the pending motions. Additionally, although Defendants do not make a ripeness argument *per se*, the Court does note that the Eighth Circuit has recently stated that "[i]n the insurance policy context, a declaratory judgment action is ripe irrespective of whether the underlying litigation is ongoing or resolved." *Scottsdale Ins. Co. v. Universal Crop Protection Alliance, LLC*, 620 F.3d 926, 934 (8th Cir. 2010). This is true even where factual issues remain in the underlying litigation. *See id.* Therefore, to the extent that Defendants have made a motion to stay (*see* Hr'g Tr. 31:14–17), and assuming, *arguendo*, that such motion is proper, that motion is denied.

Defs.' Br. re Genesis" at 4; *see also* Defs.' Mem. of Law in Resistance to Pl.'s Mot. for Summ. J. (hereinafter "Defs.' Br. re Gulf") at 6 (Clerk's No. 112-4).  Defendants base their prematurity arguments primarily on their assertion that "the law requires that the parties and the Court determine coverage based upon the relevant and admissible facts" in the Underlying Actions. Defs.' Br. re Genesis at 4.  Defendants cite a number of Iowa cases, but none of the cited cases articulate the broad proposition asserted by Defendants.  *See id.* at 6 n.2 (citing *Talen v. Employers Mut. Cas. Co.*, 703 N.W.2d 395 (Iowa 2005); *McAndrews v. Farm Bureau Mut. Ins. Co.*, 349 N.W.2d 117, 119 (Iowa 1984); *N.H. Ins. Co. v. Christy*, 200 N.W.2d 834 (Iowa 1972); and *Cent. Bearings Co. v. Wolverine Ins. Co.*, 179 N.W.2d 443, 445 (Iowa 1970)).[9]  Instead, the cases cited by Defendants merely state the much narrower principle that, in determining whether an insurer has a duty to defend, the Court may look beyond the pleadings and consider other facts that are known by the parties or that are in the record.  *See Talen*, 703 N.W.2d at 405–06; *McAndrews*, 349 N.W.2d at 119; *Christy*, 200 N.W. 2d at 838; *Cent. Bearings*, 179 N.W.2d at 445.  Although some of these cases refer to facts "in the record," none of these cases state, or even suggest, that the record must be "fully developed" before coverage can be determined. Moreover, the duty to defend—the only type of insurance coverage at issue in the cases relied upon by Defendants—is determined "based on the facts appearing at the *outset of the case*." *First Newton Nat'l Bank v. Gen. Cas. Co. of Wisc.*, 426 N.W.2d 618, 623 (Iowa 1988) (emphasis added).  Therefore, Defendants' argument that the facts in the Underlying Actions must be "fully developed" before any insurance coverage can be determined has no merit.

Defendants also argue that any determination of coverage would be premature because

---

[9]     Defendants incorrectly refer to the 2005 Iowa Supreme Court case reported at 703 N.W.2d 395 as "*Ingrahm v. Dairyland Mut. Ins. Co.*"  Defs.' Br. re Genesis at 6 n.2.

Harrington named nine "John Does" in his complaint.  *See* Defs.' Br. re Gulf at 6; Defs.' Br. re

Genesis at 4; *see also* Harrington Compl. ¶¶ 13, 314, 333, 357.  Defendants argue that coverage

cannot be determined because these "alleged tortfeasors are not yet even identified, their conduct

is unspecified, and the timing of the alleged wrong [is] undefined."   Defs.' Br. re Gulf at 6; *see*

*also* Defs.' Br. re Genesis at 4.  The Court does not agree.  The identities of any alleged John

Does are not "facts appearing at the outset of the case," and thus cannot trigger any duty to

defend.  *See First Newton*, 426 N.W.2d at 623; *see also McAndrews*,  349 N.W.2d at 119 ("[A]n

insurer is not required to provide a defense when no facts presently available to it indicate

coverage of the claim merely because such facts might later be added by amendment or

introduced as evidence at the trial.").  Moreover, although facts developed in the Underlying

Actions might bear on the issue of any duty to indemnify, the deadline to amend pleadings and

add parties in the Underlying Actions has long since past and discovery is closed.  Therefore, the

fact that Harrington initially chose to name nine unidentified defendants does not prevent the

Court from ruling on the coverage issues raised in the two pending motions.

     2.    *Iowa insurance law.*

Under Iowa law, "[t]he burden of proof rests on the insured to prove a claim is covered

by the terms of a policy."  *Schwartz v. N.Y. Life Ins. Co.*, No. 3:01-cv-10084, 2003 WL

25275947, at *3 (S.D. Iowa Feb. 5, 2003) (slip copy) (citing *Messer v. Wash. Nat. Ins. Co.*, 11

N.W.2d 727, 730 (Iowa 1943)).  Therefore, for each policy at issue, Defendants have the initial

burden of showing that the Underlying Actions are "comprehended by the policy's general

coverage provisions."  *See Modern Equip. Co. v. Cont'l W. Ins. Co., Inc.*, 355 F.3d 1125, 1128

(8th Cir. 2004) (quoting *A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.*, 842 F. Supp. 1166,

1171 (N.D. Iowa 1993)).  If Defendants meet this burden, then the insurers must prove the "applicability of any exclusion which allegedly precludes coverage."  *Id*. (quoting *A.Y. McDonald*, 842 F. Supp. at 1171).  Additionally, the Court may "take judicial notice of facts bearing on policy coverage."  *McAndrews*, 349 N.W.2d at 119.

Under Iowa law, "[t]he rules of construction of insurance policies are well established.  The insurance policy is a contract which must be construed as a whole.  The words used must be given their ordinary, not technical, meaning to achieve a practical and fair interpretation."  *Cent. Bearings*, 179 N.W.2d at 445.  "The cardinal principle in the construction and interpretation of insurance policies is that the intent of the parties at the time the policy was sold must control.  Except in cases of ambiguity, the intent of the parties is determined by the language of the policy."  *Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Federated Mut. Ins. Co.*, 596 N.W.2d 546, 550 (Iowa 1999); *see also R & J Enterprizes v. Gen. Cas. Co. of Wisc.*, No. 09-3887, 2010 WL 5111677, at *1 (8th Cir. Dec. 16, 2010).  If there is ambiguity, i.e., "[i]f the words are fairly susceptible to two interpretations[,] the one which will sustain the insured's claim will be accepted."  *Cent. Bearings*, 179 N.W.2d at 445.

> However, if after construing both the policy in question, the pleadings of the injured party and any other admissible and relevant facts in the record, it appears the claim made is not covered by the indemnity insurance contract issued, the insurer has no duty to defend or indemnify.  If such be the case, the words and phrases of the policy should not be strained to impose liability that was not intended and not purchased.

*Id*.

## B.  *Gulf's Motion*

Gulf argues that Defendants cannot prove that the Gulf Policies cover the claims in the Underlying Actions because, *inter alia*, "Claimants do not allege that they sustained injuries

resulting from any alleged 'wrongful act' that took place during Gulf's policy period." Gulf Br.

at 9.  Therefore, Gulf asks for summary judgment and a "declaration that neither the Gulf

Primary Policy nor the Gulf Excess Policy provides coverage for the Claimants' lawsuits against

the City."  *Id*. at 19; *see also* Gulf Mot. at 1–2.

As an initial matter, the Court notes that the Gulf Excess Policy contains the following

"Law Enforcement Liability Following Form Endorsement":

> This policy does not apply to any liability resulting from the operations or
> activities of any police department or any other law enforcement agency of the
> Insured including any agent or employee thereof, unless such liability is covered
> by valid and collectible underlying insurance as listed in the Schedule of
> Underlying Insurance for the full amount shown, and then only for such liability
> for which coverage is afforded under the underlying insurance.

Pls.' App. in Supp. of Their Mot. for Summ. J. (hereinafter "Gulf App.") at 35.  According to the

Schedule of Underlying Insurance, the relevant underlying insurance—i.e., for law enforcement

liability—is the Gulf Primary Policy.  *Id*. at 34.  Therefore, the Gulf Excess Policy only applies

to claims which would be covered by the Gulf Primary Policy.  *See id*.; *see generally H & R*

*Block, Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 546 F.3d 937, 939 (8th Cir. 2008).  Accordingly,

the Court will focus its analysis on whether the claims in the Underlying Actions are covered by

the Gulf Primary Policy.

As the parties claiming coverage, Defendants bear the initial burden of proving that

Claimants' claims in the Underlying Actions are "comprehended by the policy's general

coverage provisions."  *See Modern Equip. Co.*, 355 F.3d at 1128.  The Gulf Primary Policy

provides, in relevant part, that:

> 1.  WE will pay those sums that the INSURED becomes legally obligated to pay as
> DAMAGES because of WRONGFUL ACT(S) to which this insurance applies.  This
> insurance applies only to WRONGFUL ACT(S) that take place during the POLICY

PERIOD and within the POLICY TERRITORY. The WRONGFUL ACT(S) must arise out of the performance of the INSURED'S LAW ENFORCEMENT ACTIVITIES or out of the ownership, maintenance or use of premises designated in the Declarations, including the ways immediately adjoining such premises on the land) [sic] and all necessary and incidental operations.

2. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under COVERAGE A — WRONGFUL ACT(S) — DEFENSE AND SUPPLEMENTARY PAYMENTS.

Gulf App. at 21. The section entitled "Coverage A" states, in relevant part, that:

WE shall have the right and duty to defend any SUIT against the INSURED even if any of the allegations of the SUIT are groundless, false or fraudulent. . . . However, WE will have no duty to defend the INSURED against any SUIT seeking damages for WRONGFUL ACT(S) to which this insurance does not apply.

*Id*. at 22. The Gulf Primary Policy defines "suit," in relevant part, as "a civil proceeding in which monetary DAMAGES are alleged because of a WRONGFUL ACT to which this insurance applies." *Id*. at 21. Therefore, in order to prove that Claimants' claims in the Underlying Actions are "comprehended by the policy's general coverage provisions," Defendants must prove that Claimants are seeking damages "because of" a "wrongful act" that occurred during the policy—i.e., between January 1, 2000 and January 1, 2001.[10]  *See id*. at 21–22.

---

[10]        Defendants seem to be under the mistaken impression that they are entitled to coverage if they can prove that a "wrongful act" occurred—or possibly occurred—during the policy, even if Claimants do not seek damages for such acts. *See* Defs.' Br. re Gulf at 7. It is true that, generally, a court may consider facts outside of the pleadings in determining whether an insurer has a duty to defend or indemnify under an insurance contract. *See id*. (citing *Christy*, 200 N.W.2d at 838). However, by its clear language, the Gulf Primary Policy only covers: (1) "suits"—i.e., lawsuits "in which monetary DAMAGES are alleged *because of* a WRONGFUL ACT"—and; (2) "sums that the INSURED becomes legally obligated to pay as DAMAGES *because of* WRONGFUL ACT(S)." Gulf App. at 21–22 (emphasis added). If Claimants do not allege damages "because of a wrongful act," the Underlying Actions are not "suits." *See id*. at 21. Likewise, if Claimants recover damages, but did not seek those damages based on allegations of "wrongful acts," such damages would not be "sums that the INSURED becomes legally obligated to pay as DAMAGES *because of* WRONGFUL ACT(S)." *See id*.

The Gulf Primary Policy defines "wrongful act," in full, as follows:

[A]ny actual or alleged act, error or omission, neglect or breach of duty by the INSURED while conducting LAW ENFORCEMENT ACTIVITIES that results in:

1.   PERSONAL INJURY; or

2.   BODILY INJURY; or

3.   PROPERTY DAMAGE.

Continuous or repeated exposure to substantially the same generally harmful conditions shall be considered a single WRONGFUL ACT.

*Id.* at 21.

The Gulf Primary Policy defines "personal injury," to include, *inter alia*, "[f]alse arrest, detention or imprisonment, or malicious prosecution" and "[v]iolation of civil rights, including, but not limited to, violations of the Federal Civil Rights Act and similar laws." Gulf App. at 20. It further defines "bodily injury" to include, *inter alia*, "mental anguish, mental injury and humiliation . . . ." *Id.* at 19. Therefore, in order to prove that Claimants are seeking damages for a "wrongful act," Defendants must prove that Claimants are seeking damages for: (1) an actual or alleged "act, error or omission, neglect or breach of duty" by at least one Defendant that occurred between January 1, 2000 to January 1, 2001; and (2) that such "act, error or omission, neglect or breach of duty" resulted in an injury to at least one of the Claimants.[11] *See id.* at 19–21.

Gulf argues that Defendants cannot meet their burden to show a "wrongful act" during the policy period because "Claimants do not allege any act, error or omission, neglect or breach

_____

[11]     Defendants argue, in passing, that the Gulf Policy "is ambiguous and therefore must be construed against Gulf." *See* Defs.' Br. re Gulf at 17. However, Defendants do not identify any specific provisions of the Gulf Policy that could be susceptible to two reasonable interpretations. *See id.* at 17–18. Therefore, Defendants have failed to identify any ambiguity. *See Nationwide Agri-Business Ins. Co. v. Goodwin*, 782 N.W.2d 465, 470 (Iowa 2010).

-16-

of duty by the City during the Gulf policy period" and because "Claimants' alleged injuries could not have resulted from any conduct during the Gulf policy period." Gulf Br. at 9, 12.

Specifically, Gulf argues that the misconduct alleged by Claimants—e.g., "fabricating evidence and coaching or coercing witnesses into giving perjured testimony"—took place well before the beginning of the Gulf policy period.[12] *See id.* at 9–10. In their brief, Defendants focus their argument on three purported "instances" of alleged wrongful acts during the Gulf policy period.[13] *See* Defs.' Br. re Gulf at 8. At the hearing, Defendants made an additional argument regarding their alleged failure to right past wrongs during the Gulf policy period. *See* Hr'g Tr. 25:7–18. The Court will address each of these arguments in turn.

        1.     *Three "instances" of alleged wrongful acts.*

Defendants aver that the record in the Underlying Actions "reveals at least three instances of alleged Wrongful Acts" during the Gulf Policy period. Defs.' Br. re Gulf at 8. First, Defendants point to paragraph 282 in Harrington's complaint (hereinafter "Paragraph 282"). *See id.* at 8 (citing Gulf App. at 160). In Paragraph 282, Harrington alleges that "[p]ossibly more

---

[12]     Gulf also argues that Claimants' alleged injuries "were sustained no later than the time of their conviction in 1978." Gulf Br. at 13. However, Defendants do not respond squarely to this argument, focusing instead on whether or not there was an "act, error or omission, neglect or breach of duty" during the Gulf policy period and distinguishing Gulf's cases on this basis. *See* Defs.' Br. re Gulf at 14–16. Because Defendants bear the burden of proof, the Court will focus its analysis on their arguments.

[13]     In their resistance, Defendants argue that "Iowa law recognizes continuing wrong . . . and the doctrine should be applied in this case." Defs.' Resist. re Gulf at 3 (citing *Hagg v. Hawkeye Tri-Count REC*, 512 N.W.2d 558 (Iowa 1994)). However, Defendants do not elaborate on this argument in their brief, or even explain how *Hagg* might be relevant to the instant case. *See id.* In *Hagg*, the Iowa Supreme Court dealt with a completely different issue—the issue of when a tort occurs for the purpose of determining whether the statute of limitations has run. *See Hagg*, 512 N.W.2d at 558; *see also City of Erie, Penn. v. Guaranty Nat'l Ins. Co.*, 109 F.3d 156, 161 (3d Cir. 1997) ("Statutes of limitation and triggering dates for insurance purposes serve distinct functions and reflect different policy concerns.").

evidence still remains missing based on testimony from one investigating police officer, Larsen." Harrington Compl. ¶ 282. Defendants aver, without any explanation or citation to the record, that "[t]he factual basis for this allegation could only have arisen based on Mr. Larsen's deposition taken in 2000." Defs.' Br. re Gulf at 9. According to Defendants, this "would necessarily mean that there were affirmative acts . . . taken to again conceal the evidence in 2000" that would constitute "wrongful acts" under the Gulf Policies. *See id.* (emphasis omitted). The Court does not agree. Even if Harrington based Paragraph 282 on information learned at Larsen's 2000 deposition, that does *not* "necessarily mean" that Defendants actively concealed additional evidence in 2000. *See* Defs.' Br. re Gulf at 9. Moreover, Defendants contend that "all exculpatory evidence was turned over" to Claimants in 1999 and maintain that there *is* no additional missing evidence. *Id.* at 8. Indeed, Defendants have failed to point to any evidence at all from the Underlying Actions—despite the fact that discovery is closed—that even suggests that any such additional evidence remains missing. Thus, the Court is hard-pressed to see any genuine issue of material fact as to the existence of any additional missing evidence. *See* Fed. R. Civ. P. 56.

Second, Defendants point to the Claimants' allegations of conspiracy. Defs.' Br. re Gulf at 9 (citing Gulf App. at 95–96 (McGhee Compl. ¶¶ 376–81 (Count 15)) and *id.* at 172–78 (Harrington Compl. ¶¶ 344–70 (Count 3)). Defendants state that in 2000, Larsen testified "that he had a 'relatively recent meeting' with co-defendants" in the Underlying Actions, in which they discussed "the status of the person alleged to have been an exculpatory witness" and that Brown testified to a similar meeting. *See id.* at 9–10. According to Defendants, these facts "*could* support a further conspiratorial act in 2000." *Id.* (emphasis added). However, in pointing

to this deposition testimony, Defendants have, at most, only shown that there may be "some metaphysical doubt as to the material facts."[14]  *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  That is not sufficient to avoid summary judgment.[15]  *See id.*

Third, Defendants point to Claimants' allegations that Larsen and Brown "coerced false testimony and evidence from witnesses," by, *inter alia*, "threatening a 16-year-old boy with criminal consequences."  Defs.' Br. re Gulf at 10.  It appears that the "16 year-old boy" Defendants are referring to is Kevin Hughes.  *See* McGhee Compl. ¶¶ 11, 80–81; Harrington Compl. ¶¶ 72, 81.  Defendants argue that Larsen and Brown engaged in affirmative acts of "tortious conduct during depositions" by "affirmatively den[ying] and/or fail[ing] to support" Claimants' allegations regarding the coercion of false testimony.  *See* Defs.' Br. re Gulf at 10, 16.  Defendants argue that "[i]f the allegations . . . are true and Mr. Larsen and Mr. Brown coerced testimony from witnesses (including Hughes), their affirmative act in testifying to the contrary in 2000 is arguably an additional and independent Wrongful Act resulting in extended

---

[14]     Indeed, the Court is not convinced that McGhee's remaining claim for conspiracy fairly includes any acts occurring after his conviction.  His remaining conspiracy claim, Count 15, is entitled "1977 Conspiracy."  McGhee Compl. at 59.  In that count, McGhee alleges that Larsen and Brown, among others, "conspired . . . to arrest, prosecute, convict and imprison McGhee for the murder of John Schweer . . . ."  *Id.* ¶ 377.  Nothing in this count alleges that any Defendants conspired to *keep* McGhee in prison, nor does it mention—or even suggest—any conspiratorial acts in 2000.

[15]     Moreover, even if Defendants could show that a conspiratorial act occurred in 2000, the conspiracies alleged by Claimants began well prior to the inception of the Gulf Policies.  Even if those conspiracies continued into 2000, the only harm to Claimants would be a "[c]ontinuous or repeated exposure to substantially the same generally harmful conditions" that began in the 1970s.  *See* Gulf App. at 21.  Such exposure could not, under the plain terms of the Gulf Primary Policy, constitute a new, separate "wrongful act."  *See id.* ("Continuous or repeated exposure to substantially the same generally harmful conditions shall be considered a single WRONGFUL ACT.").  Although Defendants speculate that there may have been a "new conspiracy" in 2000, they offer no support for that speculation.  Defs.' Br. re Gulf at 16.

incarceration of Mr. Harrington and Mr. McGhee." *Id.* at 10. Even if the Court assumes that testifying contrary to Claimants' allegations could be an act or omission that could support a "wrongful act," neither Larsen nor Brown "testif[ied] to the contrary" in the portions of the deposition transcripts identified by Defendants. *See id.* (citing Defs.' App. re Gulf at 237 (Tr. 40:3–13); *id.* at 219 (Tr. 39 5–15)). Rather, in those portions of their depositions Larsen and Brown testified that they did not recall or know whether Hughes was told that he was facing murder charges at the time he was interrogated. *See* Defs.' App. re Gulf at 237, Tr. 40:3–13 and *id.* at 219, Tr.39 5–15. Therefore, the evidence cited by Defendants does not support their argument. Defendants have failed to demonstrate that there is a genuine issue of material fact as to any "tortious conduct during depositions" in 2000.[16]

The Court concludes that, in pointing to these three instances of purported wrongful conduct, Defendants have, at best, only raised a vague, "metaphysical doubt as to the material facts." *See Matsushita*, 475 U.S. at 586. This is not enough to avoid summary judgment. *See id.*

Moreover, even if the Court assumes, *arguendo*, that there were a genuine issue of material fact as to the existence of an act of affirmative tortious conduct by Defendants in 2000, such conduct could not constitute a "wrongful act" unless it "result[ed] in" injury to Claimants. *See* Gulf App. at 21. As an initial matter, Claimants do not specifically allege that they were

---

[16]    Even if, as Defendants suggest, Larsen and Brown concealed their past coercion of Hughes when they were deposed in 2000, such continued concealment would constitute "[c]ontinuous or repeated exposure to substantially the same generally harmful conditions" that began in the 1970s and could not, under the plain terms of the Gulf Primary Policy, constitute a new, separate "wrongful act." *See* Gulf App. at 21 ("Continuous or repeated exposure to substantially the same generally harmful conditions shall be considered a single WRONGFUL ACT.").

injured by any wrongful conduct in 2000.  Defendants aver, however, that "the alleged affirmative tortious conduct of Defendants in 2000 . . . kept Mr. Harrington and Mr. McGhee in jail nearly two more years . . . ."  Defs.' Br. re Gulf at 16; *see also id*. at 10 (arguing that the deposition testimony "result[ed] in extended incarceration of Mr. Harrington and Mr. McGhee"); *id*. at 14 (arguing that the purported wrongful conduct in 2000 "arguably impacted the ability of Mr. Harrington and Mr. McGhee to be released from jail . . . .").  This argument has no merit.  Claimants were in jail for the entire period of 1978–2003, including the "nearly two more years" noted by Defendants, as a direct result of the life sentences Claimants received in 1978.  Moreover, Defendants have not explained—let alone pointed to any evidence indicating—how Claimants might have gotten out of jail earlier but for the purported misconduct in 2000.  *See id*. at 10, 16.  Therefore, Defendants' arguments regarding any "extended incarceration" amount to little more than conjecture and conclusory speculation, neither of which are sufficient to avoid summary judgment.  *See Matsushita*, 475 U.S. at 586.

According to Defendants, Claimants have alleged tortious conduct in 2000 that "result[ed] in emotional distress and arguably new violations of Civil Rights . . . ."  *See* Defs.' Br. re Gulf at 16.  Even if the Court assumes that Claimants have made such allegations, Defendants offer no support for these bare legal conclusions.  *See id*.  In order to avoid summary judgment, Defendants must demonstrate that there are genuine issues of material fact, not mere speculation that certain legal conclusions might be theoretically possible.  The Court notes, however, that even if Defendants had established a genuine issue of material fact as to "new violations of Civil Rights," nothing in Claimants' complaints indicates that they are seeking damages for any such violations.  While the Claimants' complaints, collectively, include over

700 paragraphs of detailed factual allegations, Defendants have not pointed to a single allegation that mentions any affirmative acts of malfeasance by Defendants in 2000—let alone any separate violations of Claimants' civil rights in 2000. In other words, even if Claimants were to prove every allegation in each of their complaints and receive damages, there is no reason to believe that such awards would be "DAMAGES because of WRONGFUL ACT(s)" during the year 2000.

   2. *Failure to correct past errors*.

   Defendants also argue that, in cases involving violations of civil rights or malicious prosecutions, "there is an ongoing duty and obligation in each one of these policy periods to correct the error, to fix it, to not—to turn over the documents, to respond to the violation." Hr'g Tr. 26:12–15. According to Defendants:

> Gulf is written on a wrongful-act basis, and it requires two things, an act, error, omission, neglect, a breach of duty, and it has to be while conducting law enforcement activities resulting in a personal injury. There is no question there was a personal injury here. It includes malicious prosecution, it includes violations of civil rights. There's no question that the injury continues during that time period because there is an ongoing obligation on the part of the city and the police officers to correct this error, if, in fact, it occurred. That means that there is an act, error, or omission during the term of the Gulf policy.

*Id*. at 25:8–18. To the best of the Court's understanding, Defendants are arguing that if they made any errors in the past and did not correct them during the Gulf policy period, that failure would itself constitute an affirmative "act, error or omission, neglect or breach of duty." *See id*.; *see also id*. at 25:24. The Court does not agree. As an initial matter, Defendants do not cite—and the Court is not aware of any—authority supporting such a broad, continuing duty on the part of any of the Defendants. But even if such a duty does exist, this type of continuous failure to correct past errors would, at worse, subject Claimants to "[c]ontinuous or repeated

exposure to substantially the same generally harmful conditions" that began in the 1970s and could not, under the plain terms of the Gulf Primary Policy, constitute a new, separate "wrongful act." *See* Gulf App. at 21; *see also Sarsfield v. Great Am. Ins. Co.*, No. 08-1890, 2009 WL 1875327, at *4 (1st Cir. July 1, 2009) (interpreting policy language very similar to the relevant language in the Gulf Primary Policy and concluding that an allegation "that the defendants 'continued to cover up their misconduct' . . . is not enough to allege a 'wrongful act' occurring during the coverage period"). Therefore, the Court concludes that Defendants' purported failure to right their past wrongs in 2000 could not constitute a separate "wrongful act" during the Gulf policy period.

3.      *Conclusion - Gulf.*

In conclusion, Defendants have failed to demonstrate that there is any genuine issue of material fact as to the existence of a "wrongful act" during the Gulf Policy period. And even if there were any such "wrongful acts," Defendants have failed to demonstrate that Claimants are seeking damages because of such acts. Therefore, Defendants have failed to make a showing sufficient to establish that the Underlying Actions are "comprehended by the policy's general coverage provisions." *See Modern Equip. Co.*, 355 F.3d at 1128. Indeed, the Court is unable to discern, in Claimants' remaining claims, any suggestion—let alone allegation—that Defendants engaged in any "wrongful acts" during the Gulf policy period or that, during the Gulf policy period, either Claimant "incurred injuries distinct from those he suffered as a result of his arrest, prosecution, and ultimate conviction." *See Coregis Ins. Co. v. City of Harrisburg*, No. 1:03-cv-920, 2006 WL 860710, at *12 (MD. Pa. Mar. 30, 2006). Therefore, Gulf is entitled to summary judgment that the Gulf Policies do not provide coverage for the Underlying Actions.

C. *Genesis' Motion*

Genesis argues that Defendants cannot prove that the Genesis Policies cover the claims in the Underlying Actions because no "bodily injury" or "personal injury," as defined in the Genesis Policies, "occurred during a time that any policy issued by Genesis was in force."[17] Genesis Br. at 1. Therefore, Genesis asks for summary judgment and a declaration "that the Genesis Policies do not afford coverage for the allegations asserted" in the Underlying Actions. *Id.*

1. *Coverage under the Genesis Policies.*

Again, as the parties claiming coverage, Defendants bear the initial burden of proving that Claimants' claims in the Underlying Actions are "comprehended by the policy's general coverage provisions." *See Modern Equip. Co.*, 355 F.3d at 1128. Defendants concede that Genesis has no duty to defend under the Genesis Policies. Defs.' Br. re Genesis at 18; *see also* Genesis Ins. Co.'s App. in Supp. of its Mot. for Summ. J. as to Count III of its First Am. Compl. for Declaratory J. (hereinafter "Genesis App.") at 191, 254 (expressly stating that Genesis has "no duty to defend any claim or suit" but does have the right to associate in the defense of any case "that may create indemnification obligations"). However, the Genesis Policies do clearly implicate a duty to indemnify for covered losses. Section I of the Genesis Policies, entitled "Coverage," states, in relevant part:

A. Insuring Agreement

---

[17] Contrary to Defendants' contentions, Genesis is *not* arguing that "coverage must be denied if . . . the act causing the initial injury predated the effective dates of the Genesis policy." *See* Defs.' Br. re Genesis at 9. The Court will focus its analysis, therefore, on issues that are actually in dispute—not upon Defendants' purported responses to arguments Genesis has not made. *See, e.g.*, *id.* at 10 (arguing that the policy language forecloses any argument that the damage-causing act must occur during the policy period).

1.    Subject to the applicable Limit(s) of Insurance of this Coverage Part, we agree to indemnify the Insured for the ultimate net loss in excess of the retained limit for which the Insured becomes legally obligated to pay because of bodily injury, personal injury, advertising injury, or property damage which occurs during this policy period and to which this insurance applies.

2.    This insurance applies to bodily injury, personal injury, advertising injury, or property damage which occurs during the policy period, provided that prior to this policy period, no Insured . . . knew that the bodily injury, personal injury, advertising injury, or property damage had occurred, in whole or part.  If such listed Insured or authorized person knew, prior to this policy period, that the bodily injury, personal injury, advertising injury, or property damage occurred, then any continuation, change or resumption of such bodily injury, personal injury, advertising injury, or property damage during or after this policy period will be deemed to have been known prior to this policy period and will not be covered hereunder.

3.    Bodily injury, personal injury, advertising injury, or property damage which occurs during this period and was not, prior to this policy period, known to have occurred by an Insured . . . includes any continuation, change or resumption of that bodily injury, personal injury, advertising injury, or property damage after the end of this policy period.

[ . . . ]

In any event, the bodily injury, personal injury, advertising injury or property damage must be caused by an occurrence and the occurrence must take place in the coverage territory.

Genesis App. at 206–07, 278–79.  Therefore, in order to meet their initial burden, Defendants must prove, *inter alia*, that Claimants are seeking damages because of "bodily injury, personal injury, advertising injury, or property damage which occur[ed] during [the] policy period."  *See id*. at 206, 276.  Additionally, the covered injury "must be caused by an occurrence."  *Id*. at 207, 279.  The Genesis Policies define the term "occurrence" as follows:

1.    With respect to bodily injury and property damage, an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

2.    With respect to personal injury and advertising injury, an offense or series of related offenses.

*Id*. at 221, 293. Therefore, the definition of an "occurrence" varies with the type of injury at issue.

For "bodily injuries," an "occurrence" is an "accident." The Genesis Policies do not define the term "accident." *See id*. at 217, 289. Therefore, the term must be given its ordinary meaning. *See Cent. Bearings*, 179 N.W.2d at 445. The Court notes that in *Weber v. IMT Insurance Company*, the Iowa Supreme Court defined "accident" as "an unexpected and unintended event." *See* 462 N.W.2d 283, 287 (Iowa 1990). The Court finds that this definition fairly captures the ordinary meaning of the word and, therefore, adopts the *Weber* definition of the term "accident" for its analysis of the Genesis Policies. *See id*.; *see also United Fire & Cas. Co. v. Shelly Funeral Home, Inc.*, 642 N.W.2d 648, 652 (Iowa 2002) (adopting this definition for a policy with a similar definition of "occurrence"). In this case, Claimants have not alleged any injuries arising from any unexpected or unintended events, or from anything that could reasonably be described as "accidents." Thus, the Genesis Policies do not provide coverage for any "bodily injuries" alleged by Claimants. The Genesis Policies define "bodily injury" as "bodily injury, sickness, disease, shock, fright, mental injury or anguish, emotional distress or disability sustained by a natural person, including death resulting from any of these at any time." *Id*. at 190, 253. Therefore, the Genesis Policies do not cover Claimants' claims for mental injury, mental anguish, emotional distress or any other "bodily injuries."

For "personal injuries," an "occurrence" is an "offense or series of related offenses." The Genesis Policies define "offense" as "any of the offenses included in the definitions of advertising injury or personal injury." *Id*. at 222, 294. The Genesis Policies define "personal injury" as follows:

Personal injury means injury, *other than bodily injury*, arising out of one or more of the following offenses from the conduct of your operations:

1.    False arrest, detention or imprisonment;

2.    Malicious prosecution;

3.    The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor[;]

4.    Electronic or other publication, transmission or dissemination or storage of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

5.    Electronic or other publication, transmission or dissemination or storage of material that violates a person's right of privacy.

Personal injury also includes the following offenses, but only with respect to your law enforcement activities or your departmentally approved law enforcement activities for others:

6.    Assault or battery;

7.    Violation of civil rights;

8.    Violation of property rights;

9.    Erroneous service of process; or

10.   Failure of your law enforcement department and its employees to follow departmentally approved policy(ies) and procedure(s).

*Id*. at 222, 294 (emphasis added). The Gulf Policies do not define "false arrest, detention or imprisonment" or "malicious prosecution." Because these are described as "offenses" in the Genesis Policies, the Court interprets these terms to refer to the legal causes of action of the same names. Likewise, the Court interprets the phrase "violation of civil rights" to be at least broad enough to cover violations of the federal Civil Rights Act.

Defendants argue that, of the remaining claims, Harrington's Count 1 and McGhee's

Counts 1 and 5 allege "personal injuries," as defined in the Genesis Policies—i.e., injuries arising out of the listed offenses. *See* Defs.' Br. re Genesis at 6. These counts all allege violation of the Civil Rights Act and are "in the nature of malicious prosecution, not false arrest or false imprisonment."[18] *See* Case No. 4:03-cv-90616, Clerk's No. 225 at 9; *see also id*. at Clerk's No. 224 at 13 (noting that Claimants have "no cognizable claims for false arrest or false imprisonment"). Thus, the only "offenses" potentially relevant to Claimants' remaining claims are "malicious prosecution" and "violation of civil rights."[19] Therefore, in order to meet their initial burden, Defendants must prove that at least one of the Claimants is seeking damages for an injury—but not a "bodily injury"—"arising out of" malicious prosecution or a civil rights violation, that "occur[red] during [the] policy period." *See* Genesis App. at 222, 294; *id*. at 206, 278.

Genesis and Defendants agree that the Genesis Policies are "occurrence policies." Genesis Br. at 8; Defs.' Br. re Genesis at 9. Occurrence policies "provide[] coverage for any acts or omissions that arise during the policy period, regardless of when claims are made." *Hasbrouck v. St. Paul Fire & Marine Ins. Co.*, 511 N.W.2d 364, 366 (Iowa 1993) (internal citation omitted). Under an occurrence policy, "[t]he time of 'occurrence' is when the claimant

---

[18]     To date, there has been no suggestion to the Court that Claimants have raised any claim for "false detention."

[19]     Defendants suggest that other "personal injuries" may be alleged, specifically, "assault and battery," "erroneous service of process," and "failure of your law enforcement department and its employees to follow departmentally approved policy(ies) and procedure(s)." *See* Defs.' Br. re Genesis at 6. However, none of the remaining claims in the Underlying Actions fairly state such claims. Although Harrington does make an allegation regarding the City police's policies or procedures, he does *not* allege that officers failed to follow those policies. Rather, Harrington alleges that the police officers' allegedly wrongful acts were done in *compliance* with the City's wrongful policies or procedures. *See* Harrington Compl. ¶ 316.

sustains damages, not when the act or omission causing the damage takes place." *Tacker v. Am. Family Mut. Ins. Co.*, 530 N.W.2d 674, 676 (Iowa 1995). Neither of the sides dispute this basic proposition, but they disagree as to what it means to "sustain[] damage"—i.e., when Claimants' injuries "occurred," for insurance purposes.

Defendants argue, basically, that Claimants' alleged injuries "occurred" during every year of Claimants' incarcerations. *See* Defs.' Br. re Genesis at 9. Genesis urges this Court to reject this argument, which it describes as a "continuing injury (or multiple trigger) theory." Genesis Br. at 10. Genesis argues that Claimants' alleged injuries should be deemed to have occurred at the time "when their damages first manifested and when [Claimants] first became aware of their damages." *See id.* at 9. This issue appears to be one of first impression in Iowa. *See* Hr'g Tr. 24:4–9; Defs.' Br. re Genesis at 9; *see also* Hr'g Tr. 12:21–24.

In support of its argument, Genesis cites a number of cases in which, according to Genesis, other courts concluded that "only the policy in effect at the time of the initial bodily injury or personal injury (which occurs at the time when a defendant is taken into custody or arrested) provides coverage for claims (like those alleged here) asserting federal civil rights violations or state law claims such as . . . malicious prosecution . . ." *Id.* (citing, *inter alia*, *City of Erie*, 109 F.3d 156 and *Coregis*, 2006 WL 860710). Defendants argue that the cases cited by Genesis are distinguishable, and contend that the instant case is more analogous to *National Casualty Insurance Company v. City of Mount Vernon*.[20] Defs.' Br. at 16 (citing 515 N.Y.S.2d

---

[20]     Defendants also argue that accepting Genesis' argument (i.e., that Claimants' alleged injuries should be deemed to have occurred at the time "when their damages first manifested and when [Claimants] first became aware of their damages") would render § I(A)(2) of the Genesis Policies, which provides that coverage is not available when the insured had prior knowledge of a covered injury, "superfluous in violation of the rules of construction and interpretation under Iowa law." *See* Defs.' Br. re Genesis at 10. However, Defendants offer

267 (N.Y. App. Div. 1987)). However, *National Casualty* provides little, if any, support for Defendants' arguments. In *National Casualty*, the claimant was seeking to recover damage for, *inter alia*, false arrest and false imprisonment. The court concluded that the "damage resulting from false imprisonment represents a category of covered personal injury as defined in the policy and that such damage was allegedly sustained, at least in part, when the policy was in force." 515 N.Y.S.2d at 270–71. In reaching this conclusion, the court specifically distinguished the injuries sustained as a result of false imprisonment from those sustained as a result of malicious prosecution. *See id*. at 271 ("National's reliance upon decisions from other jurisdictions involving the tort of malicious prosecution is misplaced."). By contrast, Claimants' remaining counts in the Underlying Actions do not state claims for false imprisonment. Therefore, the analysis and conclusion in *National Casualty* is not directly relevant to the resolution of this case.

After careful consideration of the cases cited by the parties, the Court finds a number of the cases cited by Genesis to be persuasive, especially *Coregis Insurance Company v. City of Harrisburg*. The insurance policies at issue in *Coregis*, like the Genesis Policies, provided coverage for damages that the insured became obligated to pay as damages for injuries that occurred during the policy periods. *See* 2006 WL 860710, at *2–3. And in *Coregis*, as in this case, "the entire thrust of [each] underlying complaint focuses on the alleged actions and

-------------------------------------------------

little more than this bare assertion, and fail to demonstrate that, if the continuing injury theory is not applied, § I(A)(2) would have no meaning or possible application. Moreover, there may be cases where the insured could have knowledge of a covered injury prior to the date that the injury became manifest to the victim, such as cases involving latent illnesses or violations of privacy rights. *See* Genesis Policies § IV(D); *id*. § IV(A)(5). In such cases, deeming the injury to occur at the time it becomes manifest to the victim would not render § I(A)(2) superfluous. Therefore, the Court cannot accept Defendants' argument on this point.

malfeasance of law enforcement officials perpetrated before and during [the claimant's] . . . criminal trials in the 1970s that resulted in [the claimant's] conviction for . . . murder." *See id*. at *10. In that case, the court concluded that the claimant's injuries occurred, for insurance purposes, at the time they first became manifest. *See id*. at *10–11. The Court agrees, and concludes that where, as here, it is not "difficult to ascertain when the injurious effects of the tortious conduct first become manifest . . . [i]t is clearer, simpler, and fairer to define the time of the occurrence as the time the injurious effects first became apparent . . . ." *Billings v. Commerce Ins. Co.*, 936 N.E.2d 408, 413 (Mass. 2010) (internal quotation marks omitted); *see also Idaho Counties Risk Mgmt. Program Underwriters v. Northland Ins. Cos.*, 205 P.3d 1220, 1226–28 (Idaho 2009) ("The policy also makes clear that an occurrence requires a resultant injury, so we consider the time of an occurrence as being when the injurious effect first manifests itself."); *City of Erie*, 109 F.3d at 164–65 (rejecting a "multiple trigger" approach to the determination of insurance coverage for malicious prosecution claims).

In the instant case, the "personal injuries" alleged by Claimants became apparent no later than 1978, the year in which Claimants were convicted of murder and given life sentences.[21] Therefore, these injuries should be deemed to have occurred, for insurance purposes, no later than 1978. *See id*. at *36. Therefore, Claimants' claimed injuries did not occur, for insurance

---

[21] Defendants also argue that Claimants might have suffered continuing "bodily injuries," specifically, emotional distress injuries and the onset or aggravation of illnesses, including depression. *See* Defs.' Br. re Genesis at 9, 14–15. Defendants argue that these constitute "new bodily injuries" that appeared during the Genesis policy periods. However, as discussed above, "bodily injuries" are not covered by the Genesis Policies in the instant case, because Claimants have not alleged that they have been injured by an accident. The Court notes, however, that even if such "bodily injuries" were covered in this case, Defendants fail to point to any evidence that indicates that any of these injuries actually began or worsened during the Genesis policy period. *See id*. at 15. Rather, Defendants make only a vague—and apparently irrelevant—allusion to "alleged continuing torts in 1993." *Id*.

purposes, during the Genesis policy periods.

      2.     *Defendants' additional arguments*.

      a. *Ambiguity*.

Defendants also argue that the Genesis Policies are ambiguous and should therefore be construed against Genesis. *See* Defs.' Br. re Genesis at 15. Specifically, Defendants argue that the Genesis Policies are ambiguous because, according to Defendants, Genesis' interpretation of those policies does not match the policy language:

> Genesis now argues that it should not be required to provide coverage if the inception of the bodily injury or personal injury predated the effective date of the policy regardless of circumstances while its policies provide that it doesn't provide such coverage only if their [sic] was knowledge of the designated insureds prior to the inception of the policy. Which is it? Clearly there is an ambiguity and that ambiguity must be construed against Genesis and coverage must be afforded to the Defendants in this case.

*Id*. at 16. However, "[a] mere disagreement between the parties will not establish ambiguity." *R & J Enterprizes*, 2010 WL 5111677, at *1 (citing *Kibbee v. State Farm Fire & Cas. Co.*, 525 N.W.2d 866, 868 (Iowa 1994)). Under Iowa law, "[t]he test for ambiguity is an objective one: 'Is the language fairly susceptible to two interpretations?'" *Goodwin*, 782 N.W.2d at 470 (quoting *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 863 (Iowa 1991)). "Only when the policy language is susceptible to two reasonable interpretations do we find an ambiguity." *Id*. Defendants do not point to any language in the Genesis Policies that "is susceptible to two reasonable interpretations." *See id*. Therefore, Defendants have not identified any ambiguity.

      b. *Accrual of malicious prosecution claims*.

Defendants argue that the Genesis Policies should cover Claimants' malicious

prosecution claims because those claims accrued during the Genesis policy periods. Defs.' Br. re Genesis at 13. It is true that, under Iowa law, a claim for malicious prosecution does not accrue "until the proceedings upon which the action is based are terminated in favor of the defendant." *Penn v. Iowa State Bd. of Regents*, 577 N.W.2d 393, 400 (Iowa 1998) (discussing this issue in the context of the statute of limitations). It is also true that Claimants were released from jail in 2003, and the Court will assume, for the purposes of this motion, that their releases constitute terminations of the proceedings in favor of the Claimants. However, under the plain terms of the Genesis Policies, coverage is triggered by an "*injury . . . arising out of*" malicious prosecution, not by the mere accrual of a malicious prosecution claim. *See* Genesis App. at 222, 294 (emphasis added). Indeed, it is difficult to see how Claimants' release from prison can be described as an "injury" in any sense of the word. As recently stated by the Massachusetts Supreme Court, in a case involving similar policy language:

> While the termination of the underlying action is a required element and a necessary condition precedent before the malicious prosecution claim accrues for purposes of the statute of limitations, it is not an event that causes harm to the plaintiff and therefore not an "occurrence" within the meaning of the policy.

*Billings*, 936 N.E.2d at 413. The Court finds *Billings* to be persuasive authority, even though it involved the application of Massachusetts law.[22] Moreover, "[w]hile the termination of the underlying action is the event that ripens a malicious prosecution claim and starts the clock on the statute of limitations, statutes of limitation and triggering dates for insurance purposes serve

---

[22]     Indeed, Iowa law and Massachusetts law do not appear to be materially dissimilar in any relevant respect. Under Massachusetts law, like Iowa, "[t]he time of the 'occurrence' under an indemnity policy 'is not the time the wrongful act was committed, but the time when the complaining party was actually damaged.'" *Id.* (quoting *Cont'l Cas. Co. v. Gilbane Bldg. Co.*, 461 N.E.2d 209, 215 (Mass. 1984)). And, under both Iowa and Massachusetts law, favorable termination is an element of the tort of malicious prosecution. *See id.* at 411–12; *Whalen v. Connelly*, 621 N.W.2d 681, 687–88 (Iowa 2000).

distinct functions and reflect different policy concerns." *Id.* (quoting *City of Erie*, 109 F.3d at 161) (internal quotation marks omitted). Because of this fundamental difference, the Court joins those courts that "have consistently rejected the idea they are bound by the statutes of limitation when seeking to determine when a tort occurs for insurance purposes." *City of Erie*, 109 F.3d at 161 (citing cases). Therefore, the Court concludes that even if Claimants' claims for malicious prosecution arose during 2003, that fact would not—and does not—compel a conclusion that the Genesis Policies cover those claims.

      c. *Prior knowledge.*

      Defendants argue that the Genesis Policies provide coverage for injuries that first became manifest prior to the Genesis policy periods unless Genesis can prove that the covered insureds lacked prior knowledge of such injuries. *See* Defs.' Br. re Genesis at 10; Defs.' Surreply Br. in Resistance to Genesis Ins. Co.'s Mot. for Summ. J. (hereinafter "Defs.' Sur-Reply") at 5 (Clerk's No. 161). In support of this argument, Defendants point to the language of the Genesis Policies and to a January 2006 letter from a Genesis claim representative to Defendants' counsel.

      Defendants argue that § I(A)(2) of the Genesis Policies, which refers to the insureds' prior knowledge, provides that if such prior knowledge is not established, then "there IS clearly coverage for bodily injuries and personal injuries caused by acts preceding the inception of the policies . . . ." Defs.' Br. re Genesis at 10; Defs.' Sur-Reply at 5–6. Defendants characterize § I(A)(2) as a "limitation or exclusion" to the general coverage provisions of the Genesis Policies. Defs.' Br. re Genesis at 10. It is true that once an insured meets its initial burden of proving that coverage is available under the general coverage provisions, the burden shifts to the insurer to prove that an exclusion applies. *See Modern Equip. Co.*, 355 F.3d at 1128. However,

both the language of § I(A)(2) and its placement belie Defendants' characterization of that section as an exclusion. Section I(A)(2) states, by its plain terms, that coverage is available under the Genesis Policies "provided that" the insureds did not have prior knowledge. This indicates that § I(A)(2) is not an exclusion but, rather, a condition of coverage. Additionally, § I(A)(2) is located in the "Insuring Agreement" section of the Genesis Policies, not in the separate "Exclusions" section. Therefore, the Court concludes that § I(A)(2) is a general coverage provision, not an exclusion. Thus, contrary to Defendants' contentions, Genesis does not bear the burden of proving that the insureds lacked prior knowledge. *See Modern Equip. Co.*, 355 F.3d at 1128.

Defendants also argue that the January 2006 letter contains "an undeniable admission that unless or until Genesis can establish that the insured had knowledge . . . coverage IS applicable and provided." Defs.' Sur-Reply at 6. Defendants urge that this admission is "[i]nherent in the context of the letter." *See id.* However, the Court sees no such "undeniable admission" in the letter cited by Defendants. *See* Defs.' Addendum to App. in Supp. of Their Resistance to Genesis Ins. Co.'s Mot. for Summ. J. at 84. Rather, the letter simply states that if the insureds had prior knowledge of the claimed injuries, "coverage may not be applicable." *Id.* This is perfectly consistent with the Court's interpretation of § I(A)(2) as a general coverage provision and in no way establishes that Genesis has the burden of proof on the issue of prior knowledge. Therefore, the Court must reject Defendants' arguments regarding this purported burden.

3.      *Conclusion - Genesis*.

In conclusion, Defendants have failed to demonstrate that there is any genuine issue of material fact as to whether a covered injury occurred during the Genesis policy periods.

Therefore, Defendants have failed to make a showing sufficient to establish that the Underlying Actions are "comprehended by the policy's general coverage provisions." *See Modern Equip. Co.*, 355 F.3d at 1128. Indeed, the Court is unable to discern in Claimants' remaining claims, any suggestion—let alone allegation—that, during the Genesis policy periods, either Claimant "incurred injuries distinct from those he suffered as a result of his arrest, prosecution, and ultimate conviction." *See Coregis*, 2006 WL 860710, at *12. Therefore, Genesis is entitled to summary judgment that the Genesis Policies do not provide coverage for the Underlying Actions.

## IV. CONCLUSION

For the foregoing reasons, "Gulf Underwriters Insurance Company's and The Travelers Indemnity Company's Motion for Summary Judgment" (Clerk's No. 101) and "Genesis Insurance Company's Motion for Summary Judgment as to Count III of Its First Amended Complaint for Declaratory Judgment" (Clerk's No. 109) are GRANTED.

IT IS SO ORDERED.

Dated this ___20th___ day of December, 2010.

ROBERT W. PRATT, Chief Judge
U.S. DISTRICT COURT